UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ICE CASTLES, LLC, a Utah Limited Liability Company, | Case No. 4:18-cv-00571-DCN |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| LABELLE LAKE ICE PALACE, LLC, an Idaho Limited Liability Company; and LABELLE LAKE, LLC, an Idaho Limited Liability Company, | |
| Defendants. | |

## I. INTRODUCTION

The Court held a *Markman* hearing on November 4, 2019, to interpret the claims of Plaintiff Ice Castles, LLC's ("Ice Castles") patent (United States Patent No. 8,511,042 ("the '042 patent")). The Court's interpretation is set forth below.

## II. BACKGROUND

### A. Procedural Background

On December 27, 2018, Ice Castles filed the instant suit against Defendants LaBelle Lake Ice Palace, LLC, and LaBelle Lake, LLC (collectively "LaBelle Lake"). Ice Castles seeks damages and a permanent injunction against LaBelle Lake for infringement of its '042 patent, which protects Ice Castles' patented method (or process) of constructing ice structures. Simply described, Ice Castles and LaBelle Lake are business competitors who each have created outdoor winter attractions constructed of ice. These attractions include

sculptures, artistic creations, and structures visitors can enter and/or explore. Ice Castles alleges that LaBelle Lake has infringed—and continues to infringe—on one or more claims and designs of the '042 patent. LaBelle Lake denies infringement. The Court now engages in the first step of the two-part infringement analysis: claim construction.

### B. Patent at Issue

The sole patent at issue in this case is the '042 patent. The '042 patent issued on August 20, 2013 and—broadly speaking—discloses "a method for constructing a structure from ice in a low-temperature environment." Dkt. 55-1, at 2, *abstract.* This method includes "providing a plurality of icicles and attaching icicles to each other to form a framework of icicles," growing "additional ice . . . on the framework" and "attaching icicles to each other . . . as needed until the structure is completed." *Id*. In layman's terms, the '042 patent protects a method for making icicles and building structures of ice with those icicles.

## III. LEGAL STANDARD

The Court here engages in the first step of the two-step infringement analysis—determining the scope and meaning of the patent claims at issue. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, (1996). The construction of a patent is a matter of law for the Court to decide. *Id.*; *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). At the same time, the Court is not required to construe every limitation present in a patent's asserted claims. *O2 Micro Int'l Ltd*, 521 F.3d at 1359. "In

some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed.Cir.2005) (en banc).

To interpret the claims, the Court must look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language. *Id.*

In evaluating the intrinsic evidence, the Court examines first the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. *Id.* Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning if the special definition of the term is clearly stated in the patent specification or file history. *Id.*

Intrinsic evidence also includes the prosecution history of the patent, if in evidence, which includes the complete record of all the proceedings before the United States Patent and Trademark Office (USPTO), including any express representations made by the applicant regarding the scope of the claims. As such, the record before the USPTO is often of critical significance in determining the meaning of the claims. Included within an analysis of the file history may be an examination of the prior art cited therein. *Id.*

In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence.

In the rare circumstance that the court is not able to construe the claims after examining the intrinsic evidence, however, it may turn to extrinsic evidence to resolve any ambiguity. *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, *262* F.3d 1258, 1269 (Fed. Cir. 2001). Extrinsic evidence includes expert testimony, articles, and testimony of the inventor. *See generally id.* As with the intrinsic evidence, extrinsic evidence may not be used to "vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Id.*

## IV. ANALYSIS

In this case, the parties dispute the interpretation of seven (7) terms or phrases. These terms appear generally throughout the patent and/or specifically in some of the independent claims. The disputed terms, as well as the parties' proposed constructions of such terms, are summarized as follows:

| | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 1 | Icicle(s) | "An elongated piece of ice that is formed" | "A hanging, tapering piece of ice formed by the freezing of dripping water" |
| 2 | Layer(s) | Plain and ordinary meaning | "The vertical icicles in the same plane of the structure" |
| 3 | Vertically Positioned | Plain and ordinary meaning | "Positioned so the top is directly above the bottom" |
| 4 | Maintaining a Relationship Between | Plain and ordinary meaning | "Hold together for a prolonged period of time" |

| | | | |
|---|---|---|---|
| 5 | Is grown / growing | Plain and ordinary meaning | "Adding water under low temperature conditions to form icicles" |
| 6 | Elevated | Plain and ordinary meaning | "Placed higher than the surrounding area" |
| 7 | Next Lowest Layer | Plain and ordinary meaning | The term is ambiguous |

In this case, the core dispute is the appropriate definition of the term "icicle." The parties admit the construction of this term is likely dispositive and spend the majority of their time (in briefing and at oral argument) addressing it. The other terms—at least from Ice Castle's perspective—are fairly straightforward and should be given their plain and ordinary meaning without further interpretation. LaBelle Lake, on the other hand, asserts that there are some ambiguities in these terms that need to be fleshed out. The Court will address each disputed claim in turn, as well as the parties' proposed constructions.

1. Icicle(s)

| | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 1 | Icicle(s) | "An elongated piece of ice that is formed" | "A hanging, tapering piece of ice formed by the freezing of dripping water" |

The first disputed term—"icicle" or "icicles"—is found throughout the '042 patent and in most of the independent claims. The Description of the Invention outlines that the first step in the overall process for creating the embodiments specified in the patent is "the formation of icicles for use in building a structure." Dkt. 55-1, 2:18. The Description goes on to explain that the "formation of icicles may occur in a variety of fashions, as will be discussed in more detail below, and may even occur naturally." *Id.* at 2:19-21; *see also*

2:41-43 ("icicles may be formed in any of a variety of fashions, including natural icicle growth.").

While Ice Castles argues that the majority of the claims at issue in this case are straightforward and need no further construction from the Court, it does contend that the term icicle should be clarified to explain that an icicle—as used in the '042 patent—is "an elongated piece of ice that is formed." Also conversely, unlike its arguments on the other six disputed claims, LaBelle Lake argues that the term icicle should be given its plain and ordinary meaning—that of "a hanging, tapering piece of ice formed by the freezing of dripping water."

In support of its proposition, LaBelle Lake points to the specifications of the '042 patent, specifically the exemplary figures within the '042 patent, and asserts that while the "icicles may occur in a variety of fashions" language is found in the description, the only examples of icicles in the '042 patent appear to resemble the commonly understood definition of icicle—created by "dripping" water and resembling a "tapering" elongated piece of ice.

For example, Figure 3 (shown below) represents one way in which icicles can be formed or "grown." LaBelle Lake argues that this method is the sole method mentioned in the patent and that even if the Court were to broadly construe this method, the results are the same: what is being formed in each instance are conventional icicles.



*FIG. 3*

The Court begins with the language of the patent itself. When discussing the icicle

formation procedure, the Description explicitly states that figure 3 represents "one method"

of forming icicles and that "in this method" certain actions are to be followed. Dkt. 55-1,

at 2:44-45. This verbiage seems to indicate that there are *other* methods that could be

employed to achieve the same results. On this particular point, LaBelle Lake contends that

the phrase "one method," was not intended to include other methods of growing or forming

icicles, but rather that it refers to other aspects of the same method. In other words, one

method might be to use a suspended plank to from icicles; another method might be to use

a shelf of some sort. The bottom line, however—according to LaBelle Lake—is that all the "methods" would nonetheless rely on this drip methodology. The Court disagrees.

It is a longstanding tenant of claim construction—although sometimes difficult to apply in practice—that limitations or examples discussed in the specifications of the patent may not be read into the patented claims themselves. *See Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) ("Construing the claims in light of the specification does not, however, imply that limitations discussed in the specification may be read into the claims. It is therefore important not to confuse exemplars or preferred embodiments in the specification that serve to teach and enable the invention with limitations that define the outer boundaries of claim scope."); *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) ("We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that 'the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive.'"); *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1366 (Fed. Cir. 2000) ("Although the written description may aid in the proper construction of a claim term, limitations, examples, or embodiments appearing only there may not be read into the claim.").

Ice Castles analogizes this case to *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) to illustrate this principle. In *Rexnord*, the Federal Circuit held that the district court erred in construing the term "portion" as it appeared in a claim as requiring "a plurality of chain links . . . including a link module portion . . . and a cantilevered portion

extending laterally from said link module portion," where the district court construed "portion" as requiring the link module portion and cantilevered portion to be physically separate because the "preferred embodiment of the invention . . . [and] all of its representations (drawings and text), [disclosed] a two-piece structure." *Id.* at 1340. Nevertheless, the Federal Circuit explained that while the preferred embodiment only described a two-piece construction, the term "portion" broadly included both pieces that were separate and integral, and nothing in the written description or prosecution history disclaimed a one-piece or integral construction. *Id.*

While *Rexnord* is a sound example, a case even closer to home illustrates this principle as well. In *J.R. Simplot Co. v. McCain Foods USA, Inc.*, this very Court was asked to construe the term "high electric field" as used in a process for superheating potatoes before cutting them. No. 1:16-CV-00449-DCN, 2018 WL 3945374, at *9 (D. Idaho Aug. 16, 2018), *on reconsideration*, No. 1:16-CV-00449-DCN, 2019 WL 177929 (D. Idaho Jan. 11, 2019). While the patent itself did not delineate what "high" meant, the overwhelming body of intrinsic, extrinsic, and even proprietary evidence, showed that the owner of the patent only used the patent within a specified voltage range—that which was outlined in the preferred embodiment. Accordingly, the Court determined that there were "no other indications of how the [] patent's use of voltage [was] to be understood" *id.* at *8, and limited the patent to the parameters of that embodiment.

On a motion to reconsider, however, the Court reversed, in part, this limitation, quoting extensively from the seminal case of *Phillips v AWH Corp*, and the Federal Circuit's discussion outlining the difficult task a court has in determining whether an

example is just that—an example—or if it is a limitation on the patent. The same language

is apropos in the present case:

> [W]e recognize that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice. *See Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186–87 (Fed.Cir.1998) ("there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification"). However, the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. *See, e.g., Nazomi Communications, Inc. v. ARM Holdings, PLC,* 403 F.3d 1364, 1369 (Fed.Cir.2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"); *Liebel–Flarsheim,* 358 F.3d at 906–08; *Teleflex,* 299 F.3d at 1327; *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1121 (Fed.Cir.1985). In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. *Gemstar–TV Guide,* 383 F.3d at 1366. That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.
>
> To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. *See Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1533 (Fed.Cir.1987). One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive. *See SciMed Life Sys.,* 242 F.3d at 1341. The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent. *See Snow v. Lake Shore & M.S. Ry. Co.,* 121 U.S.

617, 630, 7 S. Ct. 1343, 30 L. Ed. 1004 (1887) (it was clear from the specification that there was "nothing in the context to indicate that the patentee contemplated any alternative" embodiment to the one presented).

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (emphasis added).

Ultimately, this Court in *Simplot* determined that "any examples given were just that: examples, not limitations" and that "the purpose of these examples [of voltage ranges] was to 'teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so, but [did] not limit the patent [] to these ranges and uses."

*J.R. Simplot Co. v. McCain Foods USA, Inc.*, No. 1:16-CV-00449-DCN, 2019 WL 177929, at *3 (D. Idaho Jan. 11, 2019) (*quoting Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987).

The circumstances in this case are similar. Ice Castles readily admits that the specific embodiments described and depicted in the '042 patent focus on icicle growth and the example given is of growing icicles from a board in a "dripping" fashion. That aside, it is clear that the patent is not limited to "natural ice growth." As noted above, while specific examples of the "variety of fashions" in which icicles may be formed are not laid out, the language of the patent itself broadly protects that process—which *includes*[1] natural icicle growth. In a similar vein, the fact that independent Claim 1 describes simply that a "plurality of icicles" is gathered and built (Dkt. 55-1, at 4:57), but Claim 2 specifically

---

[1] As already noted, by stating that growing icicles is "one method" of fulfilling this step in the process, it would appear that the '042 patent contemplates *other* methods. So too, in this instance, the fact that the patent notes that the formation of icicles *includes* growing icicles lends itself to the argument that the scope of how formation occurs is broader than a single style or technique.

mandates that the "plurality of icicles" is "compris[ed] [of] "growing icicles from an elevated structure" (*Id.* at 5:9-11) seems to indicate that Claim 1 is broader—as it does not lay out a specific technique as does Claim 2. *See Phillips*, 415 F.3d at 1315 ("The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). Were the Court to accept LaBelle Lake's definition it would write out a "variety of fashions" for essentially a "single fashion" construction of icicles. Such a result is impermissible. Patents are presumed valid, 35 U.S.C. § 282, and the Court's duty at a *Markman* hearing is to interpret the claims, not re-write them.[2] In sum, the Court is unwilling to construe the term as narrowly as LaBelle Lake suggests.

That aside, in order to get to Ice Castle's proposed construction, the Court would have to delve into the unknown. While the '042 patent indicates there is more than one way to form icicles, it never describes what those other methods might be. Ice Castles' correctly notes that in cases where the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the

---

[2] Finally, Ice Castles argues that Brent Christensen—the designer and owner of the '042 patent—recently filed USPTO No. 2018/0252454 title "Apparatus and methods for constructing ice structures" which seeks to patent an apparatus and method "for constructing ice structures [that] . . . may include multiple tubes." Interestingly, the '454 Application describes a particular "method of constructing a structure from ice [that] may include placing . . . tubes in a freezer until liquid within the tubes freezes into *icicles*." Dkt. 55-4. LaBelle Lake sees this as a smoking gun and argues that Christensen realized the '042 patent was too narrow and felt the need to get another patent to include other forms and methods of freezing ice. The Court is not as convinced. First, the '454 application was filed *before* this litigation. Second, Christensen calls his tubes "icicles" in the '454 patent application, thus appearing to support the idea that Christensen defines icicles broadly—by tapering and in tubes. Regardless, this evidence is extrinsic and does not substantively bear on the Court's decision today.

inventor's lexicography governs." *Phillips*, 415 at 1316. The problem, however, is that the '042 patent does not exactly do that. None of the language in the '042 patent "clearly set[s] forth an explicit definition of the term different from its ordinary meaning."[3] *Id.* at 1319 (quoting *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002)) *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("the special definition of the term [must be] clearly stated in the patent specification or file history."). Thus, the Court is inclined to give the term its "ordinary meaning." However, because the parties disagree on the definition of icicle as used in the '042 patent, it goes without saying that they will likely disagree on the ordinary meaning of the term icicle as well. The ordinary meaning, however, is not for the Court to decide at this time.

While the patent seems to indicate icicles come together in a "formation" process— whether naturally or otherwise—it does not delineate any information that would help a person of ordinary skill in the art understand what parameters, if any, are required.[4] Now to be sure, this is Ice Castles' exact point—namely that the '042 patent does not restrict the formation of icicles in any way. Be that as it may, the '042 patent also does not define the process in any meaningful way. In other words, the '042 patent does not give enough

---

[3] In addition, it is difficult to determine how, if at all, the definition differs from the plain and ordinary meaning considering there is no agreed upon plain and ordinary definition in the first place.

[4] *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[t]he patent applicant [must] set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning.); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,* 350 F.3d 1327, 1338 (Fed.Cir.2003) (claim terms "are examined through the viewing glass of a person skilled in the art").

information to illustrate a definition different from the ordinary meaning of the term icicle, or if it does, what that definition ultimately looks like. Saying "an elongated piece of ice that is formed" is—arguably—one way lay people would define icicle (in other words, there is no alternate meaning).[5] And, but for adding a directional element, LaBelle Lake probably wouldn't disagree with such a definition.

The Court, however, cannot re-write the claim so broadly as to include all ice formation (and to be fair, Ice Castles is not suggesting that necessarily);[6] but, anything the Court does could impermissibly expand the scope of the patent itself. Thus, the question before the Court now is not what the definition of icicles is in this case (in quasi-isolation) but what icicle means to people of ordinary skill in the art and, to some degree, in general.

In summary, the Court rejects LaBelle Lake's proposed construction as impermissibly narrow but also rejects Ice Castles' proposed construction as lacking support

---

[5] More importantly, however, Ice Castles' proposed definition begs the question: how? How are these elongated pieces of ice formed? The '042 patent is a method patent. Without giving some type of explanation, definition, or parameters for the formation process, the '042 patent would appear to claim *any and all* types of icicle formation.

[6] LaBelle Lake has suggested that accepting a broader definition of icicle would envelop ice formations such as ice blocks or cubes. The Court does not believe such would be the case. As LaBelle Lake outlined in its numerous icicle definitions (Dkt. 58-2), the concept of an "icicle"—in any sense of the word—denotes some type of linear, elongated, quasi-cylindrical formation of ice. The idea of blocks or cubes does not line up with any of these definitions. While the Court does not agree with LaBelle Lake's argument that blocks, cubes, and thus, igloos are somehow implicated in this case, it does agree that there is no way to determine from the language of the '042 patent when an "icicle" would cease to be an icicle and instead be considered a long thin "block" of ice (for example).

in the record.[7] Thus, in the absence of a clear alternative decision, the Court must leave the term "icicle(s)" as written and give it its plain and ordinary meaning.[8]

The Court turns next to the other disputed claim terms. In something of a dichotomy, after strenuously advocating that the term "icicles" must be given its plain and ordinary meaning because doing otherwise would "dramatically broaden the scope of the claims" (Dkt. 58, at 5), LaBelle Lake does just that with the remaining disputed claims and argues that each should be redefined. However, in each instance, LaBelle Lake's proposed definitions make the terms more difficult to understand, not less.

At a fundamental level, these claim terms and phrases comprise common, everyday words that are readily understandable—by experts and lay persons alike. Furthermore, nothing in the '042 patent does anything to alter these terms' plain and ordinary meaning. As the Court has noted elsewhere: if the term "is not difficult to understand[,] [] further defining the phrase is unnecessary." *PDT Original Designs, LLC v. HangEmRight.com, LLC*, No. 4:17-CV-00315-DCN, 2018 WL 4335614, at *5 (D. Idaho Sept. 11, 2018).

---

[7] It seems clear the '042 patent outlines a "variety of fashions" in constructing icicles. That includes, but is not limited to, "tapering," and or other iterations of "natural ice growth." Beyond that, though, is unclear. As already noted, the '042 patent does not claim *all* fashions for constructing icicles; thus, without some direction in the patent (or with only Ice Castles "ice that is formed" language to work from), it would be difficult for the public to ascertain whether a particular method for constructing icicles was protected by the '042 patent or not.

[8] Now, to be sure, it is not a jury's prerogative to *define* terms—after all, claim construction is a legal question for the Court—but it is a jury's duty to determine *infringement*. That is what must occur in this case. The Court *may*—upon a motion in limine following expert discovery—further define the term icicle or craft an appropriate jury instruction; however, it may simply leave the issues for testimony and evidence at trial. Again, the jury will not be asked to strictly define the term within the patent, but it would take the testimony and evidence in favor of the opposing definitions into consideration when determining whether there has been infringement in this case.

2. Layer(s)

| | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 2 | Layer(s) | Plain and ordinary meaning | "The vertical icicles in the same plane of the structure" |

Independent claim 18 generally recites "[a] method of building an ice structure" with "a plurality of layers" wherein the framework for each layer is built by: (1) "positioning, on the next lowest layer of the ice structure, a plurality of icicles in a vertical orientation;" (2) "positioning a plurality of icicles in a horizontal orientation on top of at least some of the vertically oriented icicles;" (3) and "attaching the plurality of horizontally oriented icicles to the vertically oriented icicles . . . ." Dkt. 55-1, at 6:60-67. In a similar vein, dependent claim 9 recites a "method for constructing a structure from ice" "wherein the sprinkler is elevated as each new layer of the framework is added." *Id.* at 5:43-44. Ice Castles proposes that "layer" be given its plain and ordinary meaning, claiming the term is clear in the context of the claims and will be readily understandable to the jury.

LaBelle Lake, however, argues that layers could be layers in the common sense (like layers on a cake) which are on the same plane, but could also be like layers in a rock which are not necessarily dispensed horizontally. To that end, LaBelle Lake proposes that the Court define the term as "the vertical icicles in the same plane of the structure."

While the term "layer" here does not mean a single icicle or horizontal layer, it is not difficult to understand in light of the specifications. Claim 18 clearly explains that the layer is comprised of some icicles in "a vertical orientation" with other icicles placed "horizontally [] [on] the vertically oriented icicles." Dkt. 55-1, at 6:60-67. As illustrated

below, that entire structure—comprising the vertical and horizontal icicles—is considered a layer. Importantly, this is where LaBelle Lake's definition falls short because it omits the presence of the horizontal icicles from the term "layer."



As will be a repeated theme throughout the remainder of this decision, while LaBelle Lake's proposed construction is a *possible* explanation, it is not a *plausible* explanation when viewed against the backdrop of the '042 patent itself. While some of these terms may have additional meanings in the abstract, when read in context, each is clear and should not be altered.

The term "layer"—although not a singular horizontal plane like a layer on a cake, but rather the combination of vertical and horizonal icicles—is easy enough to understand and should be given its plain and ordinary meaning. That is what the Court will do here.

3. Vertically Positioned / Vertical Orientation

|   | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 3 | Vertically Positioned | Plain and ordinary meaning | "Positioned so the top is directly above the bottom" |

Independent claims 1 and 18 recite methods that include, among other things, "vertically positioned" or "vertically oriented" icicles. Dkt. 55-1, at 4:63, 6:64, 66. Ice Castles proposes that the Court should give these terms their plain and ordinary meaning. While "vertically positioned" and "vertically oriented" are not expressly defined within the specification of the '042 Patent, "vertical" is a commonly understood word for which there is a widely accepted meaning.

LaBelle Lake proposes that these terms should be construed to explain that the icicles are "positioned so the top is directly above the bottom." This definition, however, causes more harm than clarity. For example, LaBelle Lake's proposal requires the "top" to be directly above the "bottom," but LaBelle Lake (and the '042 patent) never defines what constitutes the "top" or the "bottom" of an icicle. As such, regardless of whether an icicle is placed in a vertical or horizontal position, it arguably satisfies the axiom that the "top" is above the "bottom."

Additionally, there is nothing in the claims or the specification that would require the top of a vertically positioned / oriented icicle to be directly above the bottom. In other words, a "vertical" orientation does not exclude orientations that aren't exactly 90 degrees relative to the horizontal icicles. It would therefore be improper to import such a limitation into the claims.

The Court will give this term its plain and ordinary meaning.

4. Maintaining a Relationship Between

|   | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 4 | Maintaining a Relationship Between | Plain and ordinary meaning | "Hold together for a prolonged period of time" |

Asserted independent claims 1 and 18 describe a method where the icicles are attached by: "applying a slush mixture . . . to at least a first of two icicles," "contacting . . . the two icicles . . . where the slush was applied" and "maintaining a relationship . . . until the slush mixture is sufficiently frozen to secure the two icicles." Dkt. 55-1, at 7:3-7.

Ice Castles proposes that the phrase "maintaining a relationship" be given its plain and ordinary meaning because the concept of holding two objects together until something (e.g., glue, paint, some type of bonding agent) dries, cures, or freezes is readily understandable and an express construction would not clarify this easily understood and familiar concept.

LaBelle Lake, on the other hand, proffers that the phrase should be construed as "hold together for a prolonged period of time." LaBelle Lake does not provide a detailed explanation of why it wants the phrase construed this way, but suggests only that because the '042 patent fails to identify or clarify that particular phrase, it is "vague and confusing." Dkt. 58, at 22-23.

Oddly, LaBelle Lake admits that the specification outlines that the slush freezes "almost instantaneously," but likewise suggests the appropriate definition should include a time requirement—"a prolonged period of time." This is not borne out in the '042 patent,

but more importantly, without a definition of "prolonged," LaBelle Lake's interpretation is more difficult to understand as opposed to what is already in the '042 patent which focuses on the outcome (the "relationship") not necessarily how it came to be that way.

The Court will not further define this term.

5. Is Grown / Growing

| | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 5 | Is grown / growing | Plain and ordinary meaning | "Adding water under low temperature conditions to form icicles" |

Claims 1 and 18 recite methods that include "attaching icicles to each other to form a framework of icicles" or otherwise "plac[ing] icicles to form a framework on which ice is grown," and then "growing additional ice on the framework." Dkt. 55-1, at 5:4, 6:59, 6:62, 7:9. Ice Castles proposes that the terms "is grown" and "growing" should be given their plain and ordinary meaning.

LaBelle Lake argues that the term growing could mean "to increase the size of a living thing, to cause microbes to replicate . . . [or] to increase the size of an inanimate object" (Dkt. 58, at 23) and that because of these "many meanings," the phrase must be further defined. That said, LaBelle Lake notes that "in light of the numerous discussions in the specification regarding spraying water over a structure to promote the growth of icicles, a person of ordinary skill in the art would understand the terms 'grow,' 'grown,' and 'growing' to mean 'adding water to under low-temperature conditions to form icicles.'" Dkt. 58, at 24. Thus, why should the Court define something that is already understood? By LaBelle Lake's own admission, those skilled in the art know what growing means in

the '042 Patent—to add water so that it freezes and results in a larger icicle and/or ice structure. Any revised definition laying this out would be redundant.

Again, LaBelle Lake does not argue that its definition is superior for any particular reason, just that the '042 patent does not define the term and it could be misunderstood. While there is always the possibility that someone (in the abstract) could misunderstand or misinterpret this language, when viewed in context, it is not difficult to understand. Furthermore, adding language just for the sake of the language is unnecessary and repetitive.

A jury will not struggle to comprehend that ice that "is grown" or is "growing" refers to the natural process of freezing water over time to create ice that gradually increases in size. There is no need to further define this term.

6. Elevated

|   | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 6 | Elevated | Plain and ordinary meaning | "Placed higher than the surrounding area" |

Claim 9 of the '042 patent recites a method for constructing a structure from ice "wherein the sprinkler is elevated as each new layer of the framework is added." Dkt. 55-1, at 5:43-44. Ice Castles proposes that the term "elevated" be given to the jury as-is without any construction. LaBelle Lake again opines on the numerous definitions of elevated— "being raised especially above the ground or other surface, being increased beyond a normal range, and being morally or intellectually on a high plane" (Dkt. 58, at 24-25)— and opts for the phrase "placed higher than the surrounding area" as the better, alternative

definition.

Again, the term "elevated" is well within the common vocabulary that lay members of a jury would understand. What's more, LaBelle Lake's proposed construction would likely result in more confusion. Namely, LaBelle Lake provides no explanation as to what constitutes "the surrounding" in their definition of "placed higher than the surrounding area."

Furthermore, the '042 patent already explains that "[a]s each layer is raised up, the sprinkler [] or sprinklers [] may also be raised up to facilitate growth of ice on each new layer." Dkt. 55-1, at 4:33-35. In other words, "elevated" is used to denote a relative change—vis-à-vis the icicle layers themselves—and not necessarily a change with respect to a fixed point or "surrounding area."

For these reasons, the Court will not define this term further. The plain and ordinary meaning is sufficient.

7. Next Lowest Layer

|   | Term/Phrase | Ice Castle's Proposed Construction | LaBella Lake's Proposed Construction |
|---|---|---|---|
| 7 | Next Lowest Layer | Plain and ordinary meaning | The term is ambiguous |

Finally, claim 18 protects "[a] method of building an ice structure . . . [with] a plurality of layers . . . by: positioning, on the next lowest layer of the ice structure, a plurality of icicles in a vertical orientation . . . ." Dkt. 55-1, at 6:63. Ice Castles proposes that the phrase the "next lowest layer" should be given its plain and ordinary meaning because it refers to the layer that is directly below the layer that is currently being

assembled. Said differently, for Ice Castles, "next lowest" refers to the layer immediately below whatever layer you are working on—a somewhat top-down approach.

LaBelle Lake, on the other hand, claims that the term in ambiguous and cannot be construed. Instead of reading it as Ice Castles' does, LaBelle Lake reads the term to be the "next lowest" level *in relation to* the underlying layer—a somewhat bottom up approach.

For example, under Ice Castles definition, an explanatory diagram would look like this:



Meanwhile, under LaBelle Lake's definition, an explanatory diagram would look like this:



LaBelle Lake explains that "while the term 'next lowest layer' would ordinarily mean the next layer above another layer, e.g. the basement is the lowest layer of a house and the main floor is the next lowest layer, such a definition *makes no sense in light of Claim 18 of the paten*t." Dkt. 58, at 20 (emphasis added). The Court agrees: that definition does not make sense—in the abstract, or within the '042 patent.

In some esoteric sense, LaBelle Lake's argument is not completely wrong. Like standing on the opposite ends of a staircase where one viewer's perspective is raised, while the others is lowered, so too *could* this definition depend on perspective. If one were to assume that the starting point was zero/the basement/the lowest level, then the level immediately above would be the "next lowest level" in relation to the first. However, in the context of "a framework" being built by "positioning" the current layer "on the next lowest layer of the structure" (Dkt. 55-1, at 6:58-63), it is not difficult to understand that

the layers or ice are being built in an upward fashion on top of one another and the "next lowest layer" is the layer immediately below or preceding the current layer upon which the builder positions the new layer.

This term is not ambiguous or difficult to understand when viewed in context. The Court will give it its plain and ordinary meaning.

## V. CONCLUSION

In sum, disputed claim terms two through six are easy enough to understand and LaBelle Lake's proposals inject unnecessary words or phrases and run the risk of confusing, not clarifying, the issues for a jury. The Court will not redefine these terms.

The Court will also not redefine the term icicle(s), but for a different reason. While "icicle" itself is easy enough to understand, when used in the '042 patent—specifically what formation process and methodology qualifies a frozen 3D structure as an "icicle" (and what form/shape that structure takes)—the phrase is slightly more nuanced. Or at the very least, it could be. The Court simply does not know at this stage.

LaBelle Lake's proposed definition is too narrow. The Court will not read an example (i.e. a preferred embodiment) into the patent as a singular embodiment and purpose when clearly that was not the intent of the drafters. In a similar vein, however, the Court will not read in Ice Castles' open-ended definition without more support in the record.

Upon testimony and evidence, the Court *may* revisit this matter, however, it will likely be left for a finder of fact to weigh said testimony and evidence in order to determine infringement.

## VI. ORDER

The Courts construes the claims as follows:

1. Icicle(s) – defined as written/plain and ordinary meaning.

2. Layer(s) – defined as written/plain and ordinary meaning.

3. Vertically position – defined as written/plain and ordinary meaning.

4. Maintaining a relationship between – defined as written/plain and ordinary meaning.

5. Is grown / growing – defined as written/plain and ordinary meaning.

6. Elevated – defined as written/plain and ordinary meaning.

7. Next lowest layer – defined as written/plain and ordinary meaning.

DATED: March 2, 2020

David C. Nye
Chief U.S. District Court Judge